**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | | |
|---|---|---|
| ASHLEY CHANDLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 9:22-cv-01969-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| TECHNICAL COLLEGE OF THE LOWCOUNTRY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The following matter is before the court on plaintiff Ashley Chandler's

("Chandler") motion for preliminary injunction, ECF No. 5. For the reasons set forth

below, the court grants the motion.

## I.  BACKGROUND

Technical College of the Lowcountry ("TCL") is a publicly-funded technical

college that trains and educates individuals seeking licensure to practice nursing in South

Carolina. Prior to her expulsion on June 15, 2022, Chandler was enrolled in TCL's

nursing program. The nursing program requires students to complete certain program-

specific clinicals. Chandler was assigned to complete a clinical scheduled to begin on

June 14, 2022 at one of TCL's clinical partners, Memory Matters. Memory Matters had a

policy in place requiring vaccination against COVID-19 and that did not allow for

exemptions. Chandler alleges that she has a valid medical and religious exemption to

COVID-19 vaccine mandates pursuant to S.C. Act No. 142, entitled "Vaccine Mandates."

According to Chandler, TCL and Memory Matters did not accommodate her exemptions

by permitting her to attend her clinical in person or providing an alternative virtual experience.

On May 9, 2022, TCL allegedly informed Chandler, "[s]ince the clinical site [Memory Matters] is not allowing exemptions, you will need to decide whether you are willing to meet the aforementioned clinical requirement, which is required for you to progress through this course and the nursing program."  ECF No. 5-2.  Thereafter, Chandler retained legal counsel to attempt to negotiate an agreement with either TCL or Memory Matters that would allow her to complete her nursing program and graduate.  On May 10, 2022, Chandler posted to her personal Facebook page the following:

> Nursing school is challenging my exemption request again. Please pray for a resolution in my favor. Just 3 classes to go!
>
> Edited to add: I have had to hire a lawyer. Please consider giving a gift to help pay for my legal fees.

ECF No. 5-5.

On June 3, 2022, after allegedly failing to hear from the TCL nursing department regarding her grievance for some time and with a mandatory orientation scheduled to begin June 6, Chandler again posted to her personal Facebook page:

> Now I am being ghosted by the college. I've been given permission to start class while my grievance appeal is being processed. Apparently there is a course orientation scheduled for Monday, June 6. I've received ZERO communication from the nursing department since May 18. Please tell me how I can expect a fair education at this point? I'm thinking about starting a go fund me to help pay for legal fees. Here's the fundraiser: [link provided]
> Edited to add: I had to have my attorney contact the school and within MINUTES I have received an email notifying me of MANDATORY ORIENTATION AT 9AM MONDAY JUNE 6! Good thing I am not scheduled to work that day, but now I have to arrange childcare.

ECF No. 5-6.

On June 9, 2022, after receiving several communications from TCL regarding her grievance that suggested that they would not provide Chandler with an accommodation, Chandler posted on her personal Facebook page yet again:

> The saga continues……. while I was given permission by T C L to start my nursing course this week, I have been told that I am not allowed to attend a four hour clinical assignment at Memory Matters on Hilton Head. M emory M atters has enacted a vaccine mandate at their facility and they are not accepting any exemptions.
>
> The school is still refusing to provide me with an alternative experience, whether it be attending a memory matters class virtually, attend a different facility, or complete a Virtual Simulation. I have offered several solutions, and I have offered to do extra work. They've really dug in their heels, and I am at a loss to understand why. It feels personal, as if they are intentionally trying to remove me from the program. I have a religious exemption AND a medical exemption, AND my blood work shows I have NATURAL IMMUNITY to the C virus. I will continue to stand up for what I believe in and I will stand up for what is right. We've had to hire a lawyer, and due to the school and the facility dragging their heels, it is getting expensive. I started a fundraiser to help with legal fees. Link in comments.

ECF No. 5-9.

That same day, Chandler also posted on the South Carolina Medical Freedom Facebook group page:

> Hello! I am an LPN going back to college for my RN and I am being forced to choose between my Religious beliefs, my health (I also have a medical exemption), or furthering my education. While I was given permission by the College T C L to start my nursing coursing this week, I have been told that I am not allowed to attend a four hour clinical assignment at M emory M atters on Hilton Head. M emory M atters has enacted a vaccine mandate at their facility and they are not accepting any exemptions. The school is still refusing to provide me with an alternative experience, whether it be attending a memory matters class virtually, attend a different facility, or complete a Virtual Simulation. I have offered several solutions, and I have offered to do extra work. They've really dug in their heels, and I am at a loss to understand why. It feels personal, as if they are intentionally trying to remove me from the program. I have a religious exemption AND a medical exemption, AND my blood work shows I have NATURAL IMMUNITY to the C virus. I will continue to stand up for what I believe in and I will stand up for what is right. We've had to hire a lawyer, and due to

the school and the facility dragging their heels, it is getting expensive. I started a fundraiser to help with legal fees.

ECF No. 5-10.

On June 13, 2022, the day before Chandler was initially scheduled to attend her required clinical, Memory Matters sent Chandler correspondence indicating that it had reconsidered and was "allowing a one-time COVID-19 religious exemption to Ms. Chandler such that she can attend programing tomorrow, June 14, 2022." ECF No. 5-3. According to TCL, around this time, Memory Matters was made aware of one of Chandler's social media posts and informed TCL that Chandler was banned from the facility entirely, regardless of vaccination status. ECF No. 8-15. Thus, two days after purportedly receiving a religious exemption, Chandler received email correspondence from TCL's nursing program director, Vandy Amason, informing Chandler that she was being expelled from the TCL nursing program[1] and that she was no longer permitted to attend classes or clinicals. ECF No. 5-4. The expulsion email from TCL informed Chandler that it expelled her from the nursing program due to "three separate social media posts" it claimed "were unprofessional and reflect[ed] negatively upon [TCL], the health sciences division, the nursing program, and one of [TCL's] clinical facilities." Id. TCL advised Chandler that "[d]ue to these [posts], [TCL's] future partnership with the clinical affiliate is in question." Id. TCL further advised Chandler that the posts violated Section III of TCL's "Health Sciences Guidelines for Appropriate Use of Social Networking Websites" contained in TCL's Health Sciences Division Handbook. Id. The

---

[1] Chandler has not been expelled by the school entirely but has only been removed from the nursing program.

4

email stated that Chandler violated the following provisions in TCL's Health Sciences

Division Handbook:

> SECTION III: PROFESSIONAL CONDUCT
> GUIDELINES FOR APPROPRIATE USE OF SOCIAL MEDIA
> NETWORKING WEBSITES
>
> Breach of this policy may result in disciplinary action and/or termination from the program.
>
> 1. Social networking websites provide a unique opportunities [sic] for students to get to know one another, share experiences, and keep contact. As with any public forum, it is important that the users of these sites are aware of the associated risks and act in a manner that does not embarrass the student, the Health Sciences Division, clinical sites or the Technical College of the Lowcountry. It is also important to ensure patient information is not made publicly available. The Health Science Division has adopted the following guidelines to assist students safely using these sites.
>
> 2. Personal Privacy
>
> > a. We recommend setting your profiles on social networking sites so that only those individuals who you have provided access may see your personal information
> >
> > c. [sic] Be sure you are aware of the security and privacy options available to you on any sites where you post personal information. Keep in mind that privacy settings are not impervious, and information can be shared willingly or unwillingly with other [sic], even with "Friends Only" access.
>
> 3. Professionalism
>
> > a. Use of these sites can have legal ramifications. Comments made regarding care of patients or that portray you or your colleague in an unprofessional manner can be used in court or other disciplinary proceedings.
> >
> > c. [sic] Statements made under your profile are attributable to you and are treated as if you verbally made that statement in a public place.
> >
> > f. [sic] <u>Students may be subject to disciplinary actions within the College for comments that are unprofessional</u> or violate patient privacy.

g. Keep in mind you are representing the Technical College of the Lowcountry Health Sciences Division when you log on a site and make a comment or post a photograph.

SECTION I: ACADEMIC INFORMATION
C. PROGRESSION STANDARDS FOR ACADEMIC PROCESS

Standards – Students in the Health Sciences Programs are also subject to the standards detailed below:

10: A student will not be able to progress in the course sequence if:

c: there is a breach of professional standards of conduct. <u>Such actions might include but are not limited to:</u>
<u>v. failure to manage one's behavior in such a manner as to have an adverse effect on the relationship with a patient, significant other, clinical site, or colleague.</u>

<u>Id.</u> (emphases added).

On June 22, Chandler filed the instant lawsuit for injunctive relief against TCL, alleging retaliation for exercising her First Amendment rights and denial of her procedural due process rights, both in violation 42 U.S.C. § 1983.  ECF No. 1.  On June 23, 2022, Chandler filed a motion for preliminary injunction.  ECF No. 5.  On July 1, 2022, TCL responded, ECF No. 8, and on July 4, 2022, Chandler replied, ECF No. 9.  The court held a hearing on the matter on July 5, 2022.  ECF No. 10.  As such, the motion has been fully briefed and is now ripe for the court's review.

## II.  STANDARD

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  <u>United States v. South Carolina</u>, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (quoting <u>Univ. of Tex. v. Camenisch</u>, 451 U.S. 390, 395 (1981)).  "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable

6

harm in the absence of preliminary relief, [3] that the balance of the equities tips in his

favor, and [4] that an injunction is in the public interest." Winter v. Nat. Res. Def.

Council, Inc., 555 U.S. 7, 20 (2008). "To obtain a preliminary injunction under the

Winter test, a movant must make a 'clear showing' of [the] four requirements."

Alkebulanyahh v. Nettles, 2011 WL 2728453, at *3 (D.S.C. July 13, 2011); see also

Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011) ("Winter thus

requires that a party seeking a preliminary injunction . . . must clearly show that it is

likely to succeed on the merits.") (internal quotation marks omitted). As the Supreme

Court has noted, a preliminary injunction is "an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555

U.S. at 22.

### III.   DISCUSSION

Chandler seeks a preliminary injunction to preserve the status quo during the

pendency of this litigation.[2]  Specifically, Chandler requests that the court enjoin TCL

---

[2] The Fourth Circuit recognizes two categories of preliminary injunctions. "Prohibitory preliminary injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013). "Mandatory preliminary injunctions," on the other hand, "do not preserve the status quo" and instead compel action that would disturb it. Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980). The Fourth Circuit defines the status quo as the "last uncontested status between the parties which preceded the controversy." Pashby, 709 F.3d at 320 (quoting Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 378 (4th Cir. 2012)). Chandler's proposed injunction requests prohibitory relief. Although it would mandate affirmative action by TCL, the preliminary injunction would ultimately restore the last uncontested status between the parties—Chandler's enrollment in the nursing program prior to her expulsion. See Aggarao, 675 F.3d at 378 ("'To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions,' but . . . '[s]uch an injunction restores, rather than disturbs, the status quo ante.'"). Accordingly, the court does not apply the more exacting standard applicable to mandatory preliminary injunctions. See Wetzel, 635 F.2d at 286.

from enforcing its expulsion of Chandler from its nursing program and further requests that the court require TCL to readmit Chandler to its nursing program to allow her to complete her academic program.  For such an injunction to issue, Chandler must make a clear showing as to each of prong of the <u>Winter</u> test.  The court discusses each prong in turn, ultimately finding each satisfied.

### A.  Likelihood of Success on the Merits

Chandler grounds her preliminary injunction request on her First Amendment retaliation and procedural due process claims.  Chandler argues that she is likely to succeed on the merits of both of these claims.  TCL, on the other hand, argues that Chandler cannot succeed on either claim.  The court first discusses Chandler's likelihood of success on her First Amendment retaliation claim and then turns to her procedural due process claim.

### 1.  First Amendment Retaliation

The First Amendment protects not only the affirmative right to speak, but also the "right to be free from retaliation by a public official for the exercise of that right." <u>Adams v. Trs. of the Univ. of N.C.-Wilmington</u>, 640 F.3d 550, 560 (4th Cir. 2011) (citing <u>Suarez Corp. Indus. v. McGraw</u>, 202 F.3d 676, 685 (4th Cir. 2000)).  To prevail on a First Amendment retaliation claim, a plaintiff must establish the following elements: (1) the plaintiff "engaged in protected First Amendment activity," (2) "the defendants took some action that adversely affected [the plaintiff's] First Amendment rights," and (3) "there was a causal relationship between [the plaintiff's] protected activity and the defendants' conduct."  <u>Buxton v. Kurtinitis</u>, 862 F.3d 423, 427 (4th Cir. 2017) (citing <u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 499 (4th Cir.

2005)).  As explained below, Chandler has shown a likelihood of success on each of these three elements.

### a.  Protected First Amendment Activity

The first prong of the First Amendment retaliation test asks whether the plaintiff "engaged in protected First Amendment activity."  Buxton, 862 F.3d at 427.  Chandler argues that her Facebook statements, which aired her grievance with TCL and Memory Matters regarding the vaccine mandate and expressed her belief that the mandate violated South Carolina law, are constitutionally protected speech.  TCL, on the other hand, argues that it may lawfully prohibit the statements in Chandler's Facebook posts as unprofessional and having an adverse effect on its clinical sites and on other students.

It is well-established that public school students, including college students, do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969); see also Papish v. Bd. of Curators of Univ. of Mo., 410 U.S. 667, 670 (1973) (per curiam) (emphasizing that "'state colleges and universities are not enclaves immune from the sweep of the First Amendment'") (quoting Healy v. James, 408 U.S. 169, 180 (1972)).  The Supreme Court has recognized three major categories of speech that public schools, including public universities, may regulate.  Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy, 141 S. Ct. 2038, 2045 (2021).  First, schools may regulate "'indecent,' 'lewd,' or 'vulgar' speech uttered during a school assembly on school grounds."  Id. (citing Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986)).  School officials can punish students for such speech at school because it "undermine[s] the school's basic educational mission" and "is wholly inconsistent with the 'fundamental values' of public

school education." <u>Fraser</u>, 478 U.S. at 685–86.  Second, schools may regulate "speech, uttered during a class trip, that promotes 'illegal drug use.'" <u>Mahanoy</u>, 141 S. Ct. at 2045 (citing <u>Morse v. Frederick</u>, 551 U.S. 393, 409 (2007)).  Third, school officials may also "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." <u>Hazelwood Sch. Dist. v. Kuhlmeier</u>, 484 U.S. 260, 273 (1988).  Expressive activities are school-sponsored when the school "lend[s] its name and resources to the dissemination of student expression" such that "students, parents, and members of the public might reasonably perceive [that student's expression] to bear the imprimatur of the school." <u>Id.</u> at 271–73.  Beyond those three categories, the Supreme Court has stated that schools have a special interest in regulating "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others." <u>Tinker</u>, 393 U.S. at 513; <u>see also</u> <u>Papish</u>, 410 U.S. at 669–70 (recognizing "a state university's undoubted prerogative to enforce reasonable rules governing student conduct" and "legitimate authority to enforce reasonable regulations as to the time, place, and manner of speech and its dissemination").  Still, where speech occurs off campus, school officials may regulate that speech only if it has a "sufficient nexus with the school." <u>Kowalski v. Berkeley Cnty. Schools</u>, 652 F.3d 565, 577 (4th Cir. 2011).[3]

---

[3] Although Chandler presumably posted to her Facebook off campus, the parties do not dispute that the posts have sufficient nexus with the school.

The parties do not dispute that <u>Tinker</u> governs this case.  Chandler's posts were not "vulgar," "lewd," "indecent," or "plainly offensive" on their face, <u>see</u> <u>Fraser</u>, 478 U.S. at 685–86, nor can they be construed as school-sponsored speech.  Accordingly, the court follows the parties' lead and analyzes TCL's actions under the <u>Tinker</u> framework, which permits regulation of student speech that causes material and substantial disruption.  TCL argues that Chandler's speech was materially disruptive and involved substantial disorder because it reflected negatively on TCL and on its clinical site, Memory Matters.  In her Facebook posts, Chandler characterized TCL as engaging in "blatant discrimination," making decisions that felt "personal" to her, and "intentionally trying to remove her from the program."  ECF Nos. 8-17, 8-18, and 8-19.  In TCL's view, all of these posts use charged language to paint TCL and Memory Matters in a negative light.  Moreover, TCL maintains that in comments to her posts, Chandler encouraged members of the public to contact members of the TCL and Memory Matters boards in order to pressure them to allow Chandler into the Memory Matters facility, which TCL contends amounted to a material disruption.  <u>See</u> ECF No. 8-17.  Further, TCL maintains that Chandler's posts publicizing a dispute with a clinical partner was disruptive, as it could possibly negatively impact the relationship between TCL and its limited number of clinical partners.  According to TCL, there are a finite number of adequate clinical sites within the area that will agree to allow students to participate in their practice.  Clinical locations do not receive financial compensation—apart from the obvious financial benefit of free labor from the TCL students—and these clinics can choose not to participate in the affiliation for no reason.  TCL argues that Chandler's Facebook posts create a risk that Memory Matters will discontinue the clinical relationship, leaving TCL to find a new

clinical partner in the area to take students in the future.  TCL avers that its need to change the curriculum and schedule for future classes of nursing students due to Chandler's speech qualifies as a material disruption to the school.  Accordingly, TCL maintains that it is has legitimate and clearly-expressed reasons for requiring students to maintain adequate professionalism in their use of social media.

Chandler argues that TCL fails to cite any actual disruption that her posts caused in or outside the classroom.[4]  The court agrees, and counsel for TCL confirmed during the hearing that Memory Matters has not terminated its clinical relationship with TCL to date.  Regardless, the court does not find this issue dispositive.  The Tinker standard is met by showing a disruption has actually occurred or by showing "demonstrable factors that would give rise to any reasonable forecast by the school administration of 'substantial and material' disruption."  Bell v. Itawamba Cnty. Sch. Bd., 799 F.3d 379, 390–91 (5th Cir. 2015) (internal citations omitted).  In other words, "Tinker does not require school officials to wait until disruption actually occurs before they may act." LaVine v. Blaine Sch. Dist., 257 F.3d 981, 989 (9th Cir. 2001); see Doninger v. Niehoff, 527 F.3d 41, 51 (2d Cir. 2008) (holding that Tinker does not require "actual disruption to justify a restraint on student speech").  TCL can satisfy its burden by

---

[4] Although Chandler initially applied the Tinker standard in her motion, including by addressing whether her posts materially disrupted classwork, Chandler argues in her reply that "Tinker deals with speech involving high school students as opposed to college students and there is a much higher bar for prohibiting the speech of college students." ECF No. 9 at 2.  Certainly, there is a difference between the extent that a school may regulate student speech in a public university setting as opposed to that of a public elementary or high school.  However, to the extent Chandler is asserting that the material and substantial disruption test does not apply to colleges and universities, the court disagrees.  See, e.g., Murakowski v. Univ. of Delaware, 575 F. Supp. 2d 571, 591 (D. Del. 2008); Shamloo v. Miss. State Bd. of Trs. of Insts. of Higher Learning, 620 F.2d 516 (5th Cir. 1980); Thompson v. Ragland, 23 F.4th 1252, 1256 (10th Cir. 2022).

"establishing that they had a reasonable expectation, grounded in fact, that the proscribed speech would probably result in disruption." A.M. ex rel. McAllum v. Cash, 585 F.3d 214, 224 (5th Cir. 2009); see Lowery v. Euverard, 497 F.3d 584, 591–92 (6th Cir. 2007) ("Tinker does not require school officials to wait until the horse has left the barn before closing the door . . . . [It] does not require certainty, only that the forecast of substantial disruption be reasonable."). Nevertheless, "Tinker requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 211 (3d Cir. 2001). Therefore, the issue here is whether TCL has reasonably forecasted that a substantial and material disruption would result from Chandler's Facebook posts. The court finds it likely that Chandler will succeed in proving that TCL did not reasonably forecast a sufficient disruption under the Tinker standard.

At the outset, the court notes that it does not find that TCL reasonably forecasted that Chandler's comment on her post stating "please feel free to reach out to" the board of TCL or Memory Matters would cause a material and substantial disruption or that it actually caused such a disruption. See ECF No. 8-17. For one matter, TCL may not now justify removing Chandler from its nursing program by relying on disruptions that it did not cite in its communication to Chandler initially explaining her removal from the program. See Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 25–26 (1st Cir. 2020) ("The defendants may not rely on post hoc rationalizations for the speech restrictions, but rather must rely only on the reasons originally provided to [the plaintiff] for her suspension."). TCL did not include the concern that Chandler's comment would cause material or substantial disruption vis-à-vis public outreach to the boards of TCL

and Memory Matters in its expulsion email. See ECF No. 5-4. Moreover, the exhibit that TCL provides the court as evidence of Chandler's comment does not show when or where the comment or the original post was made, and the court has no information about the audience of that particular post and comment. Moreover, Chandler only invited people to contact the "board" of TCL or Memory matters, and TCL did not represent to the court the number of calls or contacts received as a result. Certainly, a few calls from the public to these boards regarding an apparent violation of law cannot reasonably be expected to have disrupted education at TCL.

The court likewise does not find that TCL reasonably forecasted a material and substantial disruption to its clinical rotations from Chandler's posts. Importantly, the parties agreed during the hearing that South Carolina law, specifically S.C. Act No. 142, requires entities like Memory Matters to honor sincere medical and religious exemptions to COVID-19 vaccine requirements. Accordingly, counsel for TCL conceded during the hearing that Memory Matters' ban of Chandler based on her vaccination status was violative of South Carolina law.[5] Chandler's Facebook posts discussed her legitimate belief that Memory Matters' failure to honor her religious and medical exemptions to its COVID-19 vaccination policy was unlawful.[6] The court does not find that TCL was reasonable in forecasting that those posts would be materially and substantially disruptive to education. Rather, Chandler's posts were intended to address the material and

---

[5] Because counsel for the parties' agreement on the matter, the court assumes without deciding that Memory Matters' COVID-19 vaccination policy as applied against Chandler was unlawful for purposes of this motion.

[6] The parties do not discuss Chandler's medical conditions or religious beliefs underlying her exemption requests. Nevertheless, the sincerity of Chandler's exemption requests is inconsequential for purposes of the instant motion.

14

substantial disruption that her unlawful ban from her clinical rotation posed to her education and that of similarly situated students.  Thus, Chandler's comments were more likely to minimize disruption to classwork than cause it.  Chandler's posts were not inflammatory, except to the extent they accused Memory Matters and TCL of the conduct that would violate South Carolina law.  Other courts have noted that "'disruption' usually refers to actual threats of harm or violence."  A.M. ex rel. Norris v. Cape Elizabeth Sch. Dist., 422 F. Supp. 3d 353, 365–66 (D. Me. 2019), aff'd sub nom. Norris, 969 F.3d 12 (citing Boim v. Fulton Cnty. Sch. Dist., 494 F.3d 978, 983 (11th Cir. 2007) and Cuff ex rel. B.C. v. Valley Cent. Sch. Dist., 677 F.3d 109, 111, 123 (2d Cir. 2012)).  Here, however, the posts did not call for threats or violence against TCL or Memory Matters.  Nor did the posts call for other conventional forms of disruption such as, say, asking students to boycott TCL or the Memory Matters rotation, or otherwise interrupt school activities to support her grievance.  Moreover, TCL does not argue that Chandler's posts contained any false information regarding Memory Matters.  In other words, there is no reason to believe Chandler's posts were anything but her efforts to advance a cooperative resolution of her grievance.  While a TCL student's exposure of a clinical partner's unlawful practice may sour TCL's relationship with that partner, the court cannot find that risk to be materially and substantially disruptive to classwork.  Although Memory Matters has expressed "significant reservations" in continuing its clinical relationship with TCL, that reservation is more appropriately attributed to Memory Matters' refusal to consider exemptions to its COVID-19 vaccination requirement than to Chandler's speech revealing the same.  ECF No. 8-25.  Regardless, the fact that Chandler's speech allegedly "put a bad taste in [Memory Matters'] mouth" is not enough to justify prohibiting it.  Id.

15

"The Supreme Court has held time and time again, both within and outside of the school context, that the mere fact that someone might take offense at the content of the speech is not sufficient justification for prohibiting it." Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 215 (3d Cir. 2001) (collecting cases); see also Tinker, 393 U.S. at 509 (holding that school officials cannot prohibit student speech based upon the desire to avoid "discomfort and unpleasantness that always accompany an unpopular viewpoint"). Based on the information before the court, it appears that TCL's disciplinary action based on Chandler's posts was motivated by its desire to avoid the discomfort and unpleasantness of its clinical partner being upset with or embarrassed by Chandler's posts. That disruption does not meet Tinker's standard.[7] See also Shanley v. Ne. Indep. Sch. Dist., 462 F.2d 960, 971 (5th Cir. 1972) ("[I]t should be axiomatic at this point in our nation's history that in a democracy 'controversy' is, as a matter of constitutional law, never sufficient in and of itself to stifle the views of any citizen.").[8]

Because the court does not find that Chandler's Facebook posts fall under the type of speech that a public college or university may lawfully regulate, the court finds that Chandler is likely to succeed in establishing that she engaged in First Amendment protected activity.

---

[7] For similar reasons, the court finds it highly unlikely that TCL will succeed in showing that Chandler's posts, which exposed a clinic's unlawful practices, undermined TCL's basic educational mission. Again, if anything, it was the apparently unlawful vaccination requirement that did not allow for exemptions that could interfere with TCL students' ability to complete the clinical component of the nursing education.

[8] Chandler additionally argues that TCL's prohibitions on speech are constitutionally overbroad and vague—specifically, its prohibition on unprofessional social media comments and behavior that has an adverse effect on the relationship with a patient, significant other, clinical site, or colleague. Because the court finds Chandler likely to succeed on the merits of her claim for other reasons, the court need not reach this argument.

16

### b. Adverse Action

The second prong of the First Amendment retaliation test asks whether "the defendants took some action that adversely affected [the student's] First Amendment rights." Buxton, 862 F.3d at 427. "[A] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017). In fact, because "conduct that tends to chill the exercise of constitutional rights might not itself deprive such rights, . . . a plaintiff need not actually be deprived of [his] First Amendment rights in order to establish . . . retaliation." Constantine, 411 F.3d at 500. Here, this second prong is easily met because a student like Chandler would be reluctant to exercise her free speech if she knew that her school would reprimand, suspend, or expel her from her educational program for doing so. TCL does not address this prong, so seemingly concedes this point.

### c. Causal Relationship

The third prong of the First Amendment retaliation test asks whether "there was a causal relationship between [the student's] protected activity and the defendants' conduct." Buxton, 862 F.3d at 427. Again, this third prong is easily satisfied because Chandler's expulsion letter specifically cites her social media posts as the basis for her expulsion. TCL does not address this prong, so seemingly concedes this point.

Accordingly, the court finds that Chandler is likely to succeed on all three elements of her First Amendment retaliation claim.

### 2. **Due Process**

The court next turns to Chandler's likelihood of success on her due process claim. "Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." Goss v. Lopez, 419 U.S. 565, 574 (1975). Chandler argues that she did not receive sufficient procedural due process in connection with her expulsion. She argues that to satisfy a student's procedural due process rights in connection with dismissal, (1) the student must be fully informed of the faculty's dissatisfaction with his progress, (2) the student must be notified of the dangerous consequences that such deficiencies pose to this continued enrollment, and (3) the ultimate decision must be careful and deliberate. See Board of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78. 85 (1978); Irani v. Palmetto Health, No. 3:14-cv-3577-CMC (D.S.C. June 1, 2016), ECF No. 188 (unreported).

TCL argues that the standard on which Chandler relies is inapplicable. The dismissals in both Horowitz and Irani were based on a failure to meet academic standards. See Irani at *56 ("Academic dismissals meet constitutional standards so long as (1) the student is fully informed of the faculty's dissatisfaction with his progress, (2) the student is notified of the dangerous consequences that such deficiencies pose to his continued enrollment, and (3) the ultimate decision is "careful and deliberate." (emphasis added)). Here, Chandler was not removed from the program for academic reasons, but instead, for her behavior in posting on social media.

The court agrees with TCL that procedural due process in this context does not entail the three requirements Chandler cites from Horowitz. The court in Horowitz recognized that "that there are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons which may call for hearings in connection with the former but not the latter." Horowitz, 435 U.S. at 87. The court noted that:

> Due process requires, in connection with the suspension of a student from public school for disciplinary reasons, "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."

Id. (quoting Goss v. Lopez, 419 U.S. 565 (1975)). In addition, the court in Horowitz recognized that "the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Id. (quoting Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961)). The court specifically did not require a formal hearing because "further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as a part of the teaching process." Id. (quoting Goss at 583).

In this case, TCL seems to have satisfied the procedural due process requirements for suspension for a disciplinary reason. The parties do not dispute that Chandler was given notice of the charges against her. Likewise, Chandler does not deny that she made the social media posts at issue. Accordingly, TCL was in all likelihood not required to give a further explanation of its evidence or give Chandler an opportunity to present her side of the story. Indeed, it does not seem that a hearing or further process in her case

19

would have provided either party any more information than it already had.  At bottom,

Chandler's conduct and the related evidence is undisputed, and the parties only dispute

whether it constituted a violation of TCL's policy.  Chandler has not provided any

authority that supports her position that she was entitled to be further heard, whether in a

formal hearing or otherwise, on that issue.  Because Chandler relies exclusively on the

standard articulated in <u>Horowitz</u> and <u>Irani</u> for expulsion for academic reasons, the court is

not convinced that Chandler was entitled to any further process in connection with her

expulsion for disciplinary reasons.  Therefore, the court at this juncture finds that

Chandler is not likely to succeed on the merits of her due process claim.  Nevertheless,

because the court finds Chandler likely to succeed on her First Amendment retaliation

claim, the court proceeds to the next prong of the <u>Winter</u> test.

### B.  Irreparable Harm

The second prong of the <u>Winter</u> test—irreparable harm—is an "indispensable"

requirement for a preliminary injunction, and in the absence of irreparable harm,

injunctive relief cannot be granted.  <u>D.T. v. Sumner Cnty. Schs.</u>, 942 F.3d 324, 326 (6th

Cir. 2019).  When a party has shown a likelihood of a constitutional violation, the party

has shown an irreparable harm.  <u>Henry v. Greenville Airport Comm'n</u>, 284 F.2d 631, 633

(4th Cir. 1960).  As such, "[a] party seeking preliminary injunctive relief in a First

Amendment context can establish irreparable injury sufficient to merit the grant of relief

by demonstrating the existence of a colorable First Amendment claim."  <u>Sammartano v.</u>

<u>First Jud. Dist. Ct.</u>, 303 F.3d 959, 973–74 (9th Cir. 2002); <u>Elrod v. Burns</u>, 427 U.S. 347,

373 (1976) ("[T]he loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury" for purposes of the issuance of a

preliminary injunction); see also 11A Charles Alan Wright, Arthur R. Miller & Mary Kay
Kane, Federal Practice and Procedure, § 2948.1 (2d ed. 2004) ("When an alleged
deprivation of a constitutional right is involved, most courts hold that no further showing
of irreparable injury is necessary").  During the hearing, counsel for TCL agreed that the
law is clear that a violation of a constitutional right amounts to irreparable harm.
Accordingly, because the court finds that Chandler has a likelihood of establishing a
constitutional injury of First Amendment retaliation, the court finds that Chandler has
sufficiently established that she will suffer irreparable injury absent preliminary
injunction barring enforcement of TCL's expulsion of Chandler from its nursing program
and requiring her readmission into the program.

### C.  Balance of Equities and Public Interest

Finally, for a preliminary injunction to issue, Chandler must show that the balance
of equities and public interest prongs of the Winter test tip in her favor.  "[C]ourts must
balance the competing claims of injury on each party of either granting or withholding
the requested relief, paying particular regard to the public consequences."  Winter, 555
U.S. at 22.  On one side of the balance, Chandler argues that protecting First Amendment
rights is in the public interest.  On the other side, TCL argues that colleges have a
legitimate interest in creating boundaries and policies that discourage students from
posting inappropriate conduct online.  TCL maintains that such posts can reflect
negatively on TCL as a whole, meaning one student's actions can impact the education of
all other students.  TCL further argues that placing the student back into school will
create an inequitable environment for the other students, as there is no way she can
complete the same requirements that all other nursing students have.

The court finds that the balance of equities and public interest tip in Chandler's favor. Certainly, the public has a significant interest in upholding free speech principles, as permitting unconstitutional retaliation infringes not only the free expression interests of a plaintiff, but also the interests of other individuals subjected to the same restrictions. See Starbucks v. Williamsburg James City Cnty. Sch. Bd., 28 F.4th 529, 536 (4th Cir. 2022) (finding that it "would be incompatible with the very purpose of public education" to prevent students from speaking on the basis that their views communicate controversial ideas); Overby v. Mayor of Balt., 930 F.3d 215 (4th Cir. 2019); N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) ("[A] profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ."). This interest is even more pronounced in the instant case, which involves a student's ability to expose and freely discuss an entity's apparent violation of South Carolina law. In the court's view, these interests far outweigh the public's interest in allowing colleges to regulate student speech that reflects poorly on it or on one of its affiliated entities. This is particularly so when the matter that reflects poorly on the college or affiliated entity is an alleged violation of the law. Moreover, if a clinic violates South Carolina law in a manner that affects the rights of TCL's students, then TCL's interest in keeping that clinical relationship intact is significantly diminished. Based on the foregoing, the court finds that Chandler has sufficiently demonstrated that the balance of equities and public interest favor the requested injunction.

### D. Bond Requirement

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security set by the court." Fed. R. Civ. P. 65(c). Nevertheless,

the Fourth Circuit has held that "the district court retains discretion to set the bond amount as it sees fit or waive the security requirement." Pashby v. Delia, 709 F.3d 307, 332 (4th Cir. 2013). "The burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm and will suffer from a wrongful restraint." Fleet Feet, Inc. v. Nike Inc., 419 F. Supp. 3d 919, 949 (M.D.N.C. 2019) (quoting Lab. Corp. of Am. Holdings v. Kearns, 84 F. Supp. 3d 447, 465 (M.D.N.C. 2015)) (internal quotation marks omitted). "The amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999)

Chandler argues that TCL is in no way harmed by the issuance of injunctive relief and that the preliminary injunction should issue without bond. TCL argues that it will be harmed by having to expend significant time locating a new clinical site for Chandler to attend in order to complete her education or create a new course of study for her to complete in lieu of attending clinical rotations. During the hearing, the court further inquired about the harm TCL would suffer should an injunction issue. Counsel for TCL did not provide specifics regarding the amount of time or effort needed to reinstate Chandler in the nursing program, but rather generally reiterated that TCL would need to determine how Chandler would make up for any missed work and to find a new placement or alternative experience for her. The court finds this harm nominal, particularly when counsel for TCL stated during the hearing that TCL recently provided alternative clinical experiences to students in light of the COVID-19 pandemic. Accordingly, because TCL fails to quantify the amount of harm it will suffer in the event

of a wrongful injunction, and because the court does not find any potential harm

particularly grave, the court will impose a bond of $500.00.

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS** the motion and **ENJOINS**

TCL from enforcing its expulsion of Chandler from its nursing program during the

pendency of this litigation.  TCL shall readmit Chandler to its nursing program without

delay.

**AND IT IS SO ORDERED.**

_____

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**July 11, 2022**
**Charleston, South Carolina**